

FILED

MAY 15 2002

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

LARRY LYLE LASKO, 99-B-0468,

                              Plaintiff,

-against-

CHRIST MELLAS, Deputy Superintendent of Programs, Ogdensburg Correctional Facility; DOUG LUMB, Vocational Supervisor, Ogdensburg Correctional Facility; ROBERT PIRIE, Senior Counselor, Ogdensburg Correctional Facility; MARK CHALOM, Facility's Medical Doctor, Ogdensburg Correctional Facility; MARRY ANN LANDRY, Nurse Administrator, Ogdensburg Correctional Facility;

                              Defendants.
_____

**DEFENDANTS'
STATEMENT OF
MATERIAL FACTS
PURSUANT TO
LOCAL RULE 7.1(a)(3)**

00-CV-1967

(LEK)(DEP)

     As and for a Statement of Material Facts under Rule 7.1(a)(3), defendants Mellas, Lumb, Pirie, Chalom and Landry state as follows:

     1.     Plaintiff Larry Lyle Lasko commenced this action by filing a complaint with the Court on December 22, 2000.  See Complaint.

     2.     At the time he commenced this action, plaintiff was incarcerated in state prison.  See Complaint ¶ 2.

     3.     Defendant Mellas, who held the position of Deputy Superintendent of Programs at Ogdensburg Correctional Facility ("Ogdensburg") during all times relevant to this action, also served

as Chairman of the Time Allowance Committee during that period.  Mellas Aff. ¶ 1.

4.    Defendant Lumb, the Education Supervisor at Ogdensburg during the times relevant to this suit, was also a member of the Program Committee at Ogdensburg.  Pirie Aff. ¶ 8.

5.    Defendant Pirie, the Senior Correction Counselor at Ogdensburg during the times relevant to this suit, was also the Chairman of the Program Committee.  Pirie Aff. ¶ 1.

6.    Defendant Chalom, a medical doctor, was the Facility Health Services Director at Ogdensburg during the times relevant to this suit.  Chalom Aff. ¶ 1.

7.    Defendant Landry, a registered nurse, was the Nurse Administrator at Ogdensburg at all times relevant to this suit.  Landry Aff. ¶ 1.

8.    Plaintiff was diagnosed with chronic Hepatitis C in 1993.  Lasko Dep. (Ullman Aff. Exhibit 1) P. 21, L. 13-17; Lasko Dep. (Ullman Aff. Exhibit 1) P. 22, L. 22-24; Landry Aff. ¶ 8; Landry Aff. Exhibit A.

9.    Plaintiff was diagnosed with chronic liver inflammation in 1995.  Lasko Dep. (Ullman Aff. Exhibit 1) P. 21, L. 18-21.

10.    Plaintiff began serving the term of incarceration at issue in this lawsuit in November of 1998.  Lasko Dep. (Ullman Aff. Exhibit 1) P. 9, L. 10-15.

11.    Plaintiff was at Hudson Correctional Facility for a period of time until late April of 2000.

12.    While at Hudson, plaintiff participated in the RSAT program.  Lasko Dep. (Ullman Aff. Exhibit 1)[1] P. 33, L. 4-9, 22-24; Lasko Dep. P. 34, L. 20-24.

---

[1] It should be noted that the transcript of plaintiff's deposition erroneously used what appears to be a phonetic spelling, "ARSAT", in place of "RSAT".

13.     "RSAT" is the Residential Substance Abuse Treatment program, similar to the Alcohol and Subtance Abuse Training ("ASAT") program. Lasko Dep. (Ullman Aff. Exhibit 1) P. 34, L. 1-6; Mellas Aff. ¶¶ 12 and 13; Pirie Aff. ¶ 11.

14.     Plaintiff did not satisfactorily complete the RSAT program. Lasko Dep. (Ullman Aff. Exhibit 1) P. 81, L. 16-24; Lasko Dep. P. 82, L. 1-15.

15.     Plaintiff did not complete the RSAT program because in April of 2000, he received an inmate misbehavior report for drug use. Lasko Dep. (Ullman Aff. Exhibit 1), P. 80, L. 6-15; Lasko Dep. P. 81, L. 16-23.

16.     The hearing officer found plaintiff guilty of the drug charges and recommended that plaintiff lose six months of good time. Mellas Aff. ¶ 7; Mellas Aff. Exhibit A.

17.     Prior to plaintiff's arrival at Ogdensburg, plaintiff was incarcerated at Greene Correctional Facility ("Greene"). A Report of Time Allowance Committee Review was prepared by the Time Allowance Committee at Greene, showing that plaintiff had a total of one year good time available. Mellas Aff. ¶ 7; Mellas Aff. Exhibit A.

18.     The Report of Time Allowance Committee Review prepared at Greene indicated that a hearing officer had recommended that he lose six months of good time for an April 2000 inmate misbehavior report. The Greene Time Allowance Committee noted that the misbehavior involved drugs and recommended that plaintiff lose a year of good time. Mellas Aff. ¶ 7; Mellas Aff. Exhibit A.

19.     The Greene Time Allowance Committee's recommendation was considered by the DOCS Commissioner's designee, Donald Selsky, Director of Special Housing and Inmate Discipline, on September 25, 2000. Director Selsky modified the recommendation and determined

that plaintiff would lose a total of six months good time, making his conditional release date from

prison May 5, 2001.  Mellas Aff. ¶ 8; Mellas Aff. Exhibit A; Lasko Dep. (Ullman Aff. ¶ 1) P. 80,

L. 6-15; Lasko Dep. P. 82, L. 18-19; Lasko Dep. P. 88, L. 12-13.

20.     The Report of Time Allowance Committee advised plaintiff that "The decision of the

Commissioner or his designee is final.  You may request reconsideration of any decision to withhold

good time by writing to the facility Time Allowance Committee Chairman." Mellas Aff. ¶ 9; Mellas

Aff. Exhibit A.

21.     Plaintiff was transferred to Ogdensburg in September of 2000.  Lasko Dep.(Ullman

Aff. Exhibit 1) p. 9, L. 19-23.

22.     Plaintiff wrote a letter dated October 9, 2000, to defendant Mellas, asking the Time

Allowance Committee at Ogdensburg to restore six months of his good time in light of his medical

condition.  Mellas Aff. ¶¶ 4 and 10; Mellas Aff. Exhibit B.

23.     Defendant Mellas responded to plaintiff's letter by memorandum dated October 10,

2000, advising that the six months of good time he had lost would not be restored, due to the

seriousness of the misbehavior which resulted in the loss of good time.  Mellas Aff. ¶ 11; Mellas Aff.

Exhibit C; Lasko Dep. (Ullman Aff. Exhibit 1) Exhibit M.

24.     Plaintiff signed out of the RSAT program during the week of October 12, 2000.

Mellas Aff. ¶ 13; Mellas Aff. Exhibit D.

25.     Plaintiff sent defendant Mellas a letter dated October 21, 2000, in which plaintiff

complained that he was not receiving adequate medical care.  Mellas Aff. ¶ 17; Mellas Aff. Exhibit

E; Lasko Dep. (Ullman Aff. Exhibit 1) P. 86, L. 17; Lasko Dep. P. 87, L. 7; Lasko Dep. Exhibit N.

26.     Defendant Mellas, as Deputy Superintendent of Programs at Ogdensburg, does not

4

have responsibility over inmate medical care. Mellas Aff. ¶ 18.

27.    Defendant Mellas nevertheless spoke with Nurse Whitman in the medical unit and was advised that plaintiff was not an appropriate candidate for the treatment he wanted, in part because he was a bad risk for the treatment. Additionally, defendant Mellas was advised that the treatment was available only if plaintiff were to remain incarcerated for at least a year in order to undergo the treatment, while he apparently was not anticipated to serve another year. Mellas Aff. ¶ 18.

28.    At Ogdensburg, plaintiff refused to participate in an alcohol and drug treatment program "so that they would hold me to my max date and then give me medical treatment." Lasko Dep. (Ullman Aff. Exhibit 1) P. 36, L. 14-20; Mellas Aff. ¶ 20.

29.    Hepatitis C is an illness characterized by liver inflammation, which is likely to become a chronic condition, and is often associated with cirrhosis of the liver. Landry Aff. ¶ 8.

30.    DOCS Health Services issued the Hepatitis C Primary Care Practice Guideline ("Hepatitis C Guideline") on March 31, 1999, and revised it in December of 1999 and December of 2000. Landry Aff. ¶ 13; Landry Aff. Exhibit D.

31.    The treatment protocol described in the Heptatitis C Guideline includes inteferon alpha 2-b injections and ribavirin pills. The combined treatment is known as Rebetron and is only available to inmates who meet certain criteria. Landry Aff. ¶ 14; Landry Aff. Exhibit B; see Chalom Aff. ¶ 4.

32.    Among the criteria for the treatment protocol is a requirement that inmates undergoing treatment for Hepatitis C complete an alcohol and substance abuse treatment program. Also required is that the inmate in question have no evidence of active substance abuse during the

5

prior six months.  Another requirement is that the inmate will be incarcerated for at least twelve months.  Landry Aff. ¶ 15;  Landry Aff. Exhibit D.

33.    Plaintiff's first application for the interferon/ribaviron treatment was electronically transmitted to DOCS Health Services and was denied by DOCS Deputy Commissioner and Chief Medical Officer Lester Wright, M.D., on January 24, 2000.  The denial was made because the plaintiff's conditional release date of November 5, 2000 was less than one year away.  Landry Aff. ¶¶ 16 and 17; Landry Aff. Exhibit E.

34.    Plaintiff's second application for the interferon/ribaviron treatment was electronically transmitted to DOCS Health Services and was denied by Dr. Wright on May 24, 2000.  The basis for the denial was that plaintiff "had a drug use problem 4/27/00.  Thus he is ineligible for treatment for six months from that date.  He needs to get ASAT begun before Hep C treatment."   Landry Aff. ¶¶ 16 and 18 ; Landry Aff. Exhibit F.

35.    Plaintiff saw Dr. Chalom on September 22, 2000 to request the Hepatitis C treatment protocol for a third time.  Landry Aff. ¶ 16; Landry Aff. Exhibit A; Landry Aff. Exhibit C.

36.    Dr. Chalom was ready to proceed with the interferon and ribavirin when it was determined that plaintiff did not meet the treatment criteria.  Landry Aff. ¶ 20 and 22; Landry Aff. Exhibit A.

37.    Plaintiff's medical records reflect that he was consistently provided with calcium carbonate, multi-vitamins (abbreviated as "MVI" in the records) and ibuprofen, which are generally helpful for individuals suffering from decreased liver function.  Landry Aff. ¶ 24; Landry Aff. Exhibt A.

38.    Had plaintiff presented with any secondary infections connected to the Hepatitis C,

the medical personnel at Ogdensburg would have been prepared to treat them accordingly.  Landry Aff. ¶ 24.

39.    During his visit with Dr. Chalom on September 22, 2000, plaintiff complained about his left wrist, which had been fractured in the past.  Landry Aff. ¶ 25; Landry Aff. Exhibit A.

40.    Dr. Chalom found that plaintiff's grip strength and range of motion were normal, and that plaintiff exhibited normal flexion, extension, proxation and supination of his fingers, wrist and elbow, meaning that he was able to make various movements without any tenderness or pain. Landry Aff. ¶ 25; Landry Aff. Exhibit A; Landry Aff. Exhibit C.

41.    Plaintiff filed an inmate grievance complaint dated October 27, 2000 and filed with the Inmate Grievance Review Committee at Ogdensburg on October 31, 2000.  Landry Aff. Exhibit A.  A copy of the grievance complaint filed by plaintiff is annexed hereto as Exhibit B.  In the complaint, plaintiff complained that (1) Dr. Chalom refused to take x-rays of plaintiff's left wrist, (2) the medical staff had not given plaintiff a particular treatment for his Hepatitis C, consisting of interferon injections and ribaviron pills, and (3) he wanted assistance with his "disability papers". Landry Aff. ¶ 10; Landry Aff. Exhibit B; Ullman Aff. Exhibit K.

42.    As Nurse Administrator, defendant Landry almost always investigated inmate grievance complaints which concern an inmate's medical care.  Landry Aff. ¶ 11.

43.    On November 2, 2000, defendant Landry conducted an investigation of the inmate grievance complaint filed by plaintiff with respect to his medical care.  Landry Aff. ¶¶ 11 and 12; Landry Aff. Exhibit C.

44.    Defendant Landry summarized her investigation in a memorandum which noted that plaintiff did not meet the criteria for the interferon/ribavirin treatment.  Landry Aff. ¶¶ 12 and 19;

Landry Aff. Exhibit C.

45.    Defendant Landry's memorandum also addressed the complaints he articulated regarding his left wrist.  The memorandum noted that Dr. Chalom's September 22, 2000 examination showed that plaintiff's grip strength and range of motion were normal, and that plaintiff exhibited normal flexion, extension, proxation and supination of his fingers, wrist and elbow, meaning that he was able to make various movements without any tenderness or pain.  There was therefore no indication of any problem warranting an x-ray.  Landry Aff. ¶ 25; Landry Aff. Exhibit C.

46.    Defendant Landry's memorandum also addressed plaintiff's complaint regarding his disability papers.  Plaintiff was attempting to obtain benefits under the federal Social Security Disability Insurance ("SSDI") program in anticipation of his upcoming release from prison.  However, as noted by defendant Landry, the SSDI criteria were revised in July of 1999, and liver disease no longer qualifies as a disability which would enable plaintiff to obtain benefits.  Landry Aff. ¶¶ 26 and 27; Landry Aff. Exhibit C.

47.    Defendant Landry does not recall receiving a request from plaintiff asking her to meet with him on or about November 6, 2000, as alleged in the complaint.  Landry Aff. ¶ 28.

48.    Plaintiff was seen by medical staff on November 9, 2000.  Landry Aff. ¶ 29.

49.    Plaintiff wrote a letter to Captain Sara Kurz at Ogdensburg, probably in November of 2000, wherein he complained about his medical condition.  Kurz Aff. ¶ 4; Kurz Aff. Exhibit A; Lasko Dep. (Ullman Aff. Exhibit 1) P. 157, L. 9-24; Lasko Dep. P. 158, L. 1-20; Lasko Dep. Exhibit HH.

50.    Defendant Landry does not recall whether she spoke with Captain Kurz regarding

8

plaintiff's medical concerns on or about November 24, 2000.  Landry Aff. ¶ 32.

51.    As memorialized in a memorandum she wrote in March of 2001, Captain Kurz recalls that she spoke with Nurse Administrator Landry concerning plaintiff's complaints.  Nurse Administrator Landry advised Captain Kurz that plaintiff did not meet the criteria for the treatment that he desired.  Kurz Aff. ¶ 5; Kurz Aff. Exhibit B.

52.    As stated in her memorandum, Captain Kurz informed plaintiff what Nurse Administrator Landry had said.  Captain Kurz does not recall advising plaintiff that Nurse Landry would meet with him.  Kurz Aff. ¶ 6; Kurz Aff. Exhibit B.

53.    Plaintiff was aware of the sick call procedures at Ogdensburg, and he could have requested sick call in order to be seen by a member of the medical staff if he had questions concerning his medical condition.  Kurz Aff. ¶ 8.

54.    While plaintiff was incarcerated at Ogdensburg, there were only two "restriction orders" issued by medical staff.  Landry Aff. ¶ 34; Landry Aff. Exhibit A.

55.    A restriction order issued on September 19, 2000, stated that plaintiff should not be permitted to work in the messhall.  There were no other medical limitations placed upon plaintiff. Landry Aff. ¶ 35; Landry Aff. Exhibit G.

56.    On October 27, 2000, plaintiff asked to see Dr. Chalom about his programming, and Dr. Chalom indicated that plaintiff had complained about his Lawn and Grounds program.  There is no indication in plaintiff's medical records that plaintiff asked the Ogdensburg medical staff to restrict his program participation prior to October 27, 2000.  Landry Aff. ¶ 36; Landry Aff. Exhibit A.

57.    A restriction order was issued on October 27, 2000, which prohibited plaintiff from

participating in active sports and from prolonged walking, required that he be housed in a bottom bunk, and restricted him to only light weight lifting (under 25 pounds).   Landry Aff. ¶ 26; Landry Aff. Exhibit H.

58.     There are four program "Modules", often called "Mods", available at Ogdensburg. Mod 1 is in the morning, Mod 2 is in the afternoon, Mod 3 is in the early evening, and Mod 4 is in the late evening.  Pirie Aff. ¶ 6.

59.     Plaintiff appeared before the Program Committee on September 25, 2000, shortly after his arrival at Ogdensburg, and was assigned to two program modules effective October 2, 2000. Pirie Aff. ¶ 9; Pirie Aff. Exhibit A; Lasko Dep. (Ullman Aff. Exhibit 1) Exhibit Q.

60.     Specifically, plaintiff was assigned to Building Maintenance for Mods 1 and 2. Plaintiff signed the Program Change Form (Exhibit A) to acknowledge the assignment.  Pirie Aff. ¶ 10; Pirie Aff. Exhibit A.

61.     Subsequently, the Committee increased plaintiff from two to three modules.  The Committee met with plaintiff on October 2, 2000.  At that time, in addition to the Building Maintenance assignment for Mods 1 and 2, the Committee also assigned plaintiff to RSAT for Mod 3, effective October 9, 2000.  Pirie Aff. ¶ 11; Pirie Aff. Exhibit B; Lasko Dep. (Ullman Aff. Exhibit 1) Exhibit R.

62.     Although defendant Pirie does not recall plaintiff complaining that he needed to be excused from programs for Mod 2 so that he could rest on account of his medical condition, defendant Pirie believes he would have advised plaintiff to obtain a medical order to that effect. Pirie Aff. ¶ 12; Lasko Dep. (Ullman Aff. Exhibit 1), P. 109, L. 4-24; Lasko Dep. P. 110, L. 1-10.

63.     Although defendant Pirie does not recall receiving any such complaint, plaintiff

10

apparently wrote him a letter containing such a complaint. Lasko Dep. (Ullman Aff. Exhibit 1) Exhibit V.

64.    Plaintiff received a response to the letter from a Counselor Long, who indicated that he was responding to the complaint on behalf of defendant Pirie. Lasko Dep. (Ullman Aff. Exhibit 1) P.111, L. 11-24; Lasko Dep. P. 112, L. 1-8; Lasko Dep. Exhibit W.

65.    Plaintiff also apparently made such a complaint to the RSAT counselor on October 10, 2000, one day after plaintiff was assigned to RSAT. Plaintiff withdrew from the program, claiming that it intefered with his need for bed rest. Pirie Aff. ¶ 13; Pirie Exhibit C; Lasko Dep. (Ullman Aff. Exhibit 1) Exhibits FF and GG.

66.    Plaintiff appeared before the Program Committee on October 16, 2000. His programs were changed to Lawn and Grounds for Mod 1, and Pre-GED (an academic program) for Mod 2. Pirie Aff. ¶ 14; Pirie Aff. Exhibit D; Lasko Dep. (Ullman Aff. Exhibit 1) Exhibit S.

67.    Defendant Pirie does not recall what in particular prompted the adjustment from three to two programming modules, but asserts that because plaintiff had refused the RSAT program, his assignments had to be changed. Pirie Aff. ¶ 15.

68.    On November 2, 2000, the Committee prepared a Program Change Form which sought to assign plaintiff to Lawn and Grounds for Mod 1 and to the Pre-GED program for Mod 2. Pirie Aff. ¶ 16; Pirie Aff. Exhibit E; Lasko Dep. (Ullman Aff. Exhibit 1) Exhibit T.

69.    However, a medical order prohibiting plaintiff from heavy lifting was either sent to the Program Committee by the medical department or was brought to the Committee by plaintiff when he appeared before the Committee on November 6, 2000. Because of the order, plaintiff was removed from Lawn and Grounds and switched to General Business for Mod 1 and Pre-GED for

11

Mod 2 effective November 17, 2000.  Pirie Aff. ¶ 17; Pirie Exhibit E; Lasko Dep. (Ullman Aff.

Exhibit 1) Exhibit T.

     70.    Plaintiff was released from state prison on May 5, 2001, on conditional release.

Lasko Dep. (Ullman Aff. Exhibit 1) p. 9, L. 16-18; Lasko Dep. (Ullman Aff. Exhibit 1) p. 10, L. 2-4;

Mellas Aff. ¶ 16.

     71.    Following his release, plaintiff was required to report to a parole office for six

months, until November 5, 2001.  Lasko Dep. (Ullman Aff. Exhibit 1) p. 10, L. 4-14.

Dated: Albany, New York
      May 15, 2002

                        ELIOT SPITZER
                        Attorney General of the State of New York
                        Attorney for Defendants
                        Office of the Attorney General
                        The Capitol
                        Albany, New York  12224

                        LISA ULLMAN
                        Assistant Attorney General, Of Counsel
                        Bar Roll No. 508090
                        Telephone:  (518) 486-4155

TO:    LARRY LYLE LASKO
       Plaintiff Pro Se
       991 Smith Creek Road
       Nichols, New York 13812